## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **3:17-CR-00084 (VLB)** |
| **v.** | **:** | |
| | **:** | **January 9, 2017** |
| **KYLE HAMPTON** | **:** | |

## MEMORANDUM OF DECISION DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED FROM MOTOR VEHICLE STOP [DKT. NO. 38]

### I.   Introduction

Defendant Kyle Hampton brings this motion seeking suppression of evidence obtained during and following a motor vehicle stop conducted by the New Haven police on January 16, 2015.  For the reasons that follow, Defendant's Motion to Suppress [Dkt. No. 38] is DENIED.

### II.   Background

The following uncontested facts are taken from the Defendant's memorandum in support of his motion to suppress.

Police reports indicate that on January 16, 2015 at approximately 5:29 p.m. officers responded to a report of a gunshot near 21 Judson Street in New Haven. One witness interviewed by officers on the scene reported that a group of black men argued loudly near two vehicles parked next to each other immediately prior to the shot.  One of these vehicles was a newer, silver four-door Toyota Camry, and the other was a newer, black four-door BMW with tinted windows.  A witness also observed two men run into the backyard of 21 Judson Street after the gunshot, and another witness stated that the black BMW that had been observed was often parked in front of the Hampton family home, at 31-33 Judson Street.

1

Several other witnesses interviewed gave similar accounts, including that a tan Lexus, a gray vehicle, and a black vehicle left the area after the shot was fired. Officers broadcast a report to be on the lookout ("BOLO") for these vehicles. A search of the area failed to uncover any bullet or shell casings and no injuries were reported.

Approximately two and a half hours later, while Officer David W. Diaz was patrolling near Elm Street and Sherman Avenue in New Haven, Officer Diaz observed a black BMW matching the description of the vehicle involved in the alleged shooting change lanes without signaling. Officer Diaz entered the BMW's license plate number into his mobile computer terminal to determine who the registered owner of the car was. As he was doing this, the BMW pulled over to the right side of the roadway, approximately seven or eight blocks away from the scene of the reported shooting. Officer Diaz then pulled in behind the vehicle and activated his police emergency lights. Prior to exiting the police cruiser, the mobile computer terminal search notified Officer Diaz that the BMW was registered to the Defendant, and that his address was 31 Judson Avenue. Officer Diaz then notified dispatch of the motor vehicle stop.

Before backup arrived, Officer Diaz approached the BMW and the defendant lowered all four of the vehicle's windows. The officer instructed the Defendant to show Officer Diaz his license, registration, and insurance card, and the Defendant complied with this request. Officer Diaz reported that he smelled a strong marijuana odor coming from inside the vehicle while he stood outside of it, and consequently asked the Defendant to exit the vehicle. Officer Diaz then

2

observed a plastic bag containing a green leafy plantlike substance in the driver's side door panel.  Officer Diaz asked the Defendant if this substance was marijuana, to which the Defendant replied, "Yes, I have my medical marijuana card."  Since the marijuana was in a clear plastic bag and not in the typical prescription marijuana packaging, Officer Diaz placed the Defendant under arrest.

Following his arrest, other officers arrived on the scene and began conducting a search of the vehicle incident to arrest.  The officers found a .45 caliber handgun in the glove box and approximately 4.6 ounces of marijuana.  The Defendant was also in possession of $1,454 in U.S. currency.

III.   Discussion

A. Evidentiary Hearing

Defendant requested an evidentiary hearing in his motion to suppress.  "[A]n evidentiary hearing on a motion to suppress ordinarily is required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'"  *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (quoting *United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir. 1979)).  Further, a defendant seeking a hearing must submit "an affidavit of someone alleging personal knowledge of the relevant facts."  *United States v. Barrios*, 210 F.3d 355, 2000 WL 419940, at *1 (2d Cir. Apr. 18, 2000) (citing *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967)).  The Defendant has not attached any affidavits to his submission and has not argued that any portions of the police reports describing the alleged shooting and the motor vehicle stop are

inaccurate.  Moreover, the Government does not dispute any material issues of fact, and the briefing is definite, specific, and detailed enough for the Court to fairly adjudicate Defendant's motion without a hearing.  The Defendant's request for an evidentiary hearing is therefore DENIED.

B. Propriety of Stop

The Defendant argues that Officer Diaz performed the traffic stop because he believed that the Defendant's car was connected to the alleged shooting.  The Government counters that the alleged shooting is irrelevant to the propriety of the stop, because Officer Diaz observed Hampton changing lanes without signaling, in violation of Conn. Gen. Stat. § 14-242(a), which provides that "[n]o person shall . . . move right or left upon a highway . . . without giving an appropriate signal."  This improper lane change is sufficient to give Officer Diaz probable cause to conduct a traffic stop, regardless of the involvement of the BMW in the alleged shooting, and regardless of Officer Diaz's subjective motivations.[1]  *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d Cir. 1998) ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance" and the Court must "judge the reasonableness of an officer's actions based on the

---

[1] Despite stating that he "assume[s] *arguendo* that the police officer did, in fact, observe the defendant perform an improper lane change," the Defendant does not deny that he changed lanes without signaling immediately before the traffic stop.  Asserting a fact for the sake of argument without contesting that fact is insufficiently nonconjectural to justify holding an evidentiary hearing on this issue.

4

objective circumstances surrounding her actions and not on her subjective intent.").

C. **Propriety of Search**

Warrantless searches of automobiles may be permissible (1) as incident to a lawful arrest; or (2) under the "automobile exception."

1. **Search Incident to Arrest**

"Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351 (2009). The parties do not dispute that the Defendant was beyond reaching distance of the passenger compartment at the time of the search at issue.[2] Therefore, to determine whether the search was justifiable as incident to the Defendant's arrest, the Court must evaluate whether Officer Diaz had probable cause to arrest the Defendant for Failure to Keep Narcotic Drug in Original Container, in violation of Conn. Gen. Stat. § 21a-257, and whether it was reasonable for the police to believe that the vehicle contained evidence of this offense.

Defendant argues that Officer Diaz lacked probable cause to arrest him for violating Conn. Gen. Stat. § 21a-257, because the statute does not cover medical marijuana and there is no other statute requiring that medical marijuana be kept in any particular packaging. The Government argues that the Defendant's arrest arose out of Officer Diaz's reasonable belief that marijuana was a narcotic under

---

[2] The Defendant was accompanied in the vehicle by one passenger, who had exited the vehicle but had not been placed in handcuffs prior to the search.

the statute, and that his arrest was therefore the product of an objectively reasonable mistake of law.

The Fourth Amendment permits a search or seizure based on a mistake of law, as long as this mistake arises out of an objectively reasonable interpretation of an ambiguous state law. *Heien v. North Carolina*, 135 S. Ct. 530, 540-41 (U.S. 2014) (Kagan, J., concurring); *accord United States v. Diaz*, 854 F.3d 197, 204 (2d Cir. 2017). A statute is sufficiently ambiguous "when the law at issue is so doubtful in construction that a reasonable judge could agree with the officer's view." *Heien*, 135 S. Ct. at 541; *see also Diaz*, 854 F.3d at 204 (holding that an officer's belief that a common stairwell within an apartment building was a "public place" under an open container law was reasonable in light of trial court decisions holding that while an apartment building lobby and a bodega were "public places," an apartment building elevator was not). "A court tasked with deciding whether an officer's mistake of law can support a seizure" must determine whether a "statute is genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work." *Heien*, 135 S. Ct. at 541.

No "hard interpretive work" is required to conclude that marijuana is not a narcotic substance under section 21a-257. Section 21a-257 requires that any person prescribed a "narcotic drug" must possess it "only in the container in which it was delivered to the recipient by the [physician, dentist, pharmacist or other person authorized under the provisions of Conn. Gen. Stat. § 21a-248]

selling or dispensing the same." Conn. Gen. Stat. § 21a-257. Section 21a-240

defines a "narcotic substance"[3] as "any of the following":

> (A) Morphine-type: (i) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate which are similar thereto in chemical structure or which are similar thereto in physiological effect and which show a like potential for abuse, which are controlled substances under this chapter unless modified; (ii) any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in clause (i), but not including the isoquinoline alkaloids of opium; (iii) opium poppy and poppy straw;
>
> (B) cocaine-type, coca leaves and any salt, compound, derivative or preparation of coca leaves, and any salt, compound, isomer, derivatives or preparation thereof which is chemically equivalent or identical with any of these substances or which are similar thereto in physiological effect and which show a like potential for abuse, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine."

Conn. Gen. Stat. § 21a-240(30). Section 21a-240(8) sets forth separate categories

of "controlled substances," including "amphetamine-type, barbiturate-type,

cannabis-type, cocaine-type, hallucinogenic, morphine-type and other stimulant

and depressant drugs," which suggests that "cannabis-type" and "morphine-

type" or "cocaine-type" substances are mutually exclusive. The statute also

defines "cannabis-type substances" and "marijuana" identically, and in a way

that is not compatible with the definitions of "morphine-type" and "cocaine-type"

substances stated in the definition of "narcotic substance."[4] *See* Conn. Gen.

---

[3] A "substance" under the statute includes a "drug." *See* Conn. Gen. Stat. § 21a-240(17) (Drugs include "substances, other than food, intended to affect the structure or any function of the body of man or animals").

[4] "Cannabis-type substances and "marijuana" are both defined as "all parts of any plant, or species of the genus cannabis or any infra specific taxon thereof, whether growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin . . . Included are cannabinon,

Stat. §§ 21a-240(7) and (29).  Consequently, no reasonable judge could interpret sections 21a-240 and 21a-257 as requiring that medical marijuana only be possessed in the container in which it was delivered or dispensed by licensed prescriber or distributor.  Defendant's arrest for violating section 21a-257 therefore cannot be justified as resulting from an objectively reasonable mistake of law.  Nevertheless, for the reasons set forth in the following section, the search was justified under the automobile exception.

## 2. Automobile Exception

The scope of a search authorized by the automobile exception is "'broader than that authorized in searches incident to arrest," and "the limitations placed on searches incident to arrest do not apply" where there is "probable cause to conduct the search of the vehicle pursuant to the separate and conceptually distinct automobile exception." *United States v. Pascual*, 502 F. App'x 75, 79 (2d Cir. 2012) (quoting *Gant*, 556 U.S. at 347).

"[I]it is generally understood that "probable cause to search is demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989)

---

cannabinol or cannabidiol and chemical compounds which are similar to cannabinon, cannabinol or cannabidiol in chemical structure or which are similar thereto in physiological effect, and which show a like potential for abuse, which are controlled substances under this chapter unless modified."  Conn. Gen. Stat. § 21a-240(29)

(quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) ("[P]robable cause means 'a fair probability that contraband or evidence of a crime will be found.'"); *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 553 F.3d 150, 151 (2d Cir. 2008) ("A probable cause inquiry focuses on whether the evidence known to officers indicates a likelihood that items appropriate for seizure might be found at the location to be searched.").  While "probable cause demands more than a 'mere suspicion' of wrongdoing," *Ganek v. Leibowitz*, 874 F.3d 73, 83 (2d Cir. 2017) (quoting *Mallory v. United States*, 354 U.S. 449, 454 (1957)), "it does not demand 'hard certainties,'" *Southerland v. City of New York*, 681 F.3d 122, 127 (2d Cir. 2012) (quoting *Gates*, 462 U.S. at 231).  "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Gates*, 462 U.S. at 232.

Pursuant to the automobile exception, "if a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  *United States v. Howard*, 489 F.3d 484, 494 (2d Cir. 2007) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).  "[A]n automobile search is not unreasonable if based upon facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained*."  *United States v. Navas*, 597 F.3d 492, 500 (2d Cir. 2010) (emphasis in original) (quoting *Howard*, 489 F.3d at 495).  This is because automobiles are both "inherently mobile," and therefore "readily . . . put out of

reach of a search warrant," and because "citizens possess a reduced expectation of privacy in their vehicles." *Navas*, 597 F.3d at 497-98.

"The scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982). To determine whether a search was reasonable under the Fourth Amendment, the Court must "ask whether the circumstances, viewed objectively, justify the challenged action. If so, that action was reasonable *whatever* the subjective intent motivating the relevant officials." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quotations and citations omitted). Thus, if the totality of circumstances surrounding the Defendant's traffic stop, viewed objectively, gave rise to probable cause to *search* the BMW, it is irrelevant that Officer Diaz *arrested* the Defendant without probable cause immediately before the search.

The Defendant argues that there was no probable cause for the search because (1) there was insufficient evidence of an unlawful discharge of a firearm prior to the search; (2) the link between the gunshot and the defendant was too tenuous to justify a search; (3) any information linking the BMW with the shooting was stale by the time of the stop; and (4) the smell of marijuana and visual identification of a small amount of a substance that appeared to be marijuana were insufficient to justify the search because the Defendant had been prescribed marijuana pursuant to Conn. Gen. Stat. §§ 21a-408 *et seq.*

a. <u>Unlawful Discharge of a Firearm</u>

The Defendant first argues that no probable cause existed to search his car for evidence related to the alleged shooting, because the police found no bullets, shell casings, gunshot victims, or other physical evidence of a shooting. [Dkt. No. 38-1 at 2, 6]. However, the police uncovered evidence that a shot was fired through interviews of several witnesses who stated that they heard a gunshot,[5] and that men and cars fled the area immediately afterward. A witness also identified one of the cars fleeing the scene as being a black BMW frequently parked outside of the Hampton residence, and prior to the search, Officer Diaz confirmed that the black BMW he planned to stop was registered to Kyle Hampton at a Judson Street address.

While this evidence may not establish beyond a reasonable doubt that a shot was fired from the BMW, "the probable cause standard is far below that of reasonable doubt." *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 127 (2d Cir. 2009) (citing *United States v. Delossantos,* 536 F.3d 155, 161 (2d Cir. 2008)). Courts in the Second Circuit have found probable cause to arrest shooting suspects where evidence that a shooting had occurred was based largely on auditory observations and other circumstantial evidence, rather than on physical evidence or the visual observation of a gun being fired. *See, e.g., Husbands*, 335 F. App'x 124, 127 (2d Cir. 2009) (holding that probable cause to arrest existed, even if an officer did not see a gun, where gunshots "suddenly

---

[5] Despite Defendant's attempt to introduce the possibility that witnesses heard "a loud sound" consistent with "a car backfiring or a firework being lit," [Dkt. No. 38-1 at 6-7], there is no evidence that any witnesses reported hearing only a "loud sound" or equivocated about whether what they heard was in fact a gunshot.

rang out," the officer looked in the direction from which the shots had been fired, saw a suspect standing alone, and that suspect turned around and moved away from the area); *United States v. Zimmerman*, 86 F. Supp. 3d 124, 131 (N.D.N.Y. 2015) (denying a motion to suppress ammunition uncovered during a vehicle search incident to arrest, and holding that probable cause for the arrest giving rise to this search existed where an officer heard a "distinct popping noise," eyewitnesses confirmed hearing a similar sound and believing that it was a gunshot, and a confidential informant stated that he heard the gunshot coming from a particular car and gave the officer the license plate number). "It makes no difference that an important fact establishing probable cause was a noise. Probable cause can be established by a suspicious sound as it can be by a suspicious smell or appearance." *United States v. Jackson*, 652 F.2d 244, 252 n.6 (2d Cir. 1981) (finding probable cause where a driver resembled a robbery suspect and officer heard a thump coming from the driver's trunk).

Defendant also argues that Officer Diaz lacked probable cause for the search because two and a half hours elapsed between the shooting and the stop, the vehicle was stopped within eight blocks of Judson Avenue, and the vehicle was not driving in the direction indicated by witnesses. "To justify a search, probable cause must be current and not rest on facts which existed in the past, unless there is reason to believe those facts are still in existence." *United States v. Diaz*, 303 F. Supp. 2d 84, 90 (D. Conn. 2004) (citing *United States v. Beltempo*, 675 F.2d 472, 477 (2d Cir. 1982)). Information justifying a search is stale when it "is so old that it casts doubt on whether the fruits or evidence of a

crime will still be found at a particular location." *Diaz*, 303 F. Supp. 2d at 90

(quoting *United States v. Lamb*, 945 F. Supp. 441, 460 (S.D.N.Y. 1996)).  The

Second Circuit has warned against adopting an "arbitrary 'cut-off' . . . beyond

which probable cause ceases to exist" because doing so "improperly substitutes

a rigid formula" for an "informed judgment" based on the totality of

circumstances.  *Beltempo*, 675 F.2d at 478.  These circumstances include "the

currency and specificity of the information, the reliability of the sources of

information, the nature of the alleged criminal activity, the duration of that activity

in the location in question and the nature of the evidence being sought."  *Diaz*,

303 F. Supp. 2d at 90 (quoting *United States v. Paul*, 692 F. Supp. 186, 191

(S.D.N.Y. 1988)).

While none of the witnesses interviewed by police reported actually seeing

a firearm, the police gathered multiple statements confirming witnesses' belief

that a shot had been fired and that a car resembling the Defendant's black BMW

was seen driving away from the shooting's location.  Given that a firearm was not

recovered from the scene, it is reasonable to assume that at least one of the

individuals seen fleeing the scene would be in possession of a firearm.  And

because at least one person fled in what was probably the Defendant's black

BMW, there was also reason to believe that a firearm or other evidence consistent

with a shooting—such as blood, gunshot residue, bullet holes, or ammunition—

would be found in the car.  While a firearm and ammunition are relatively small

and moveable, bullet holes, blood, and residue would be difficult to remove within

two and a half hours.  Moreover, while an individual involved in a shooting might

want to dispose of the weapon immediately afterward, it is equally likely that he would choose to keep the gun close at hand, to protect himself from retaliatory violence.  The fact that the police stopped the BMW two and a half hours after the shot, a relatively short distance away from the scene, and heading in a different direction than it was traveling when it left the scene, is insufficient to render any of the witness statements about the gunshot and the BMW's connection to the gunshot stale.  These statements, along with Officer Diaz's confirmation that the vehicle was registered to a member of the Hampton family at an address in the vicinity of the reported shot, gave Officer Diaz probable cause to search the vehicle.

b. <u>Illegal Drug Possession and/or Use</u>

Even if the information connecting the BMW with the shooting were not alone sufficient to create probable cause, Defendant's evasive maneuvers and visual and olfactory evidence that Defendant had marijuana in his vehicle would tip the scales.  Considering a totality of the circumstances, it was reasonable for an officer to believe that evidence of a crime would be found within the vehicle. *Cf. United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) (reasonable suspicion when Jaguar double-parked for nearly half hour after which suspect returned to car carrying brown paper bag and drove away in evasive manner while repeatedly looking in rearview mirror); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").  Here the operator acted suspiciously by pulling over abruptly and, after

the officer activated his emergency lights, opening all four car windows despite the fact that it was winter.

While reasonable suspicion requires less than probable cause, the Second Circuit has found that an officer has an independent basis for reasonable suspicion where the officer detects a marijuana odor emanating from a vehicle. *See, e.g., United States v. Jenkins,* 452 F.3d 207, 214 (2d Cir. 2006) *cert. denied,* 549 U.S. 1008 (2006) (holding that despite reasonable but mistaken belief that an initial traffic stop was lawful, officers had a "particularized and objective basis for suspecting legal wrongdoing" when they detected marijuana odor emanating from the vehicle as the "police officer approached the SUV to tell the driver he was free to go"). Moreover, the Western District of New York has held that the automobile exception justified the warrantless search of a vehicle for narcotics, where an officer detected marijuana odor emanating from the vehicle, the suspect gave the officer a lit marijuana cigarette and indicated he had additional marijuana in his pocket, and the officer observed bag of what appeared to be marijuana in the interior pocket of the car. *United States v. Wiggins,* No. 12-CR-6114L, 2013 WL 1645180, *1, 6, 12 (W.D.N.Y. 2013). And the distinctive smell of marijuana—burnt or unburnt—creates probable cause that it will be found within a vehicle. *See United States v. Goolsby,* No. 15-CR-6095, 2016 WL 7368373, at *2 (W.D.N.Y. Dec. 20, 2016) (finding probable cause to search defendant's vehicle and any containers within the vehicle where marijuana might be stored, where the officer smelled marijuana, and the defendant admitted smoking marijuana "earlier").

Defendant argues that because he claimed to have a marijuana card authorizing him to possess marijuana for medical use, evidence that he merely possessed a small quantity of marijuana did not give rise to probable cause to search his vehicle.  [Dkt. No. 38-1 at 9-10].  The Government counters that even if the marijuana was legally possessed, the fact that the officer observed Defendant driving his vehicle and then smelled marijuana through open car windows gave the officer probable cause to arrest him for driving while under the influence of marijuana.  [Dkt. No. 40 at 10-11].  The Court is unconvinced that the odor of marijuana alone, where the officer did not state that he observed smoke or smelled "burning" marijuana, and where the officer noted no evidence of impairment, is sufficient to support an arrest for driving under the influence in violation of Conn. Gen. Stat. §14-227a(1).  However, the existence of at least a small quantity of marijuana within the vehicle—as evidenced both by the marijuana odor and the officer's observation of a marijuana-like substance on the driver's side door—is a circumstance relevant to the probable cause determination.  This circumstance, combined with Defendant's decision to suddenly pull his car off to the side of the road, Defendant's efforts to reduce the marijuana smell within the BMW by opening all of its windows in the middle of a New England winter, and Officer Diaz's visual observation of marijuana in packaging more consistent with illegal drug possession than marijuana prescribed legally under state law, could all support reasonable conclusions that Defendant's possession or use at the time of the traffic stop was not lawful, and

that additional evidence of illegal possession or use could be found within the vehicle.

Courts in this district have not considered whether a medical marijuana card can render a search for evidence of illegal drug possession impermissible under Connecticut state law, where a police officer detects a marijuana odor or visually identifies a small quantity of marijuana.  And states permitting or decriminalizing the possession of marijuana for recreational or medicinal purposes have developed different standards for determining when marijuana's odor can give rise to a search.  *See, e.g., Colorado v. Zuniga*, 372 P.3d 1052, 1060 (Colo. 2016) ("[T]he odor of marijuana remains relevant to probable cause determinations and can support an inference that a crime is ongoing even though possession of one ounce or less of marijuana is allowed under Colorado law. Many marijuana-related activities remain illegal in Colorado, meaning the detection of a marijuana odor—particularly a "heavy" odor—still adds to the totality of the circumstances and can contribute to a probable cause determination."); *Arizona v. Sisco*, 239 Ariz. 532, 538 (2016), *cert. denied*, 137 S. Ct. 701 (2017) ("[T]he general proscription of marijuana in Arizona and [medical marijuana act's] limited exceptions thereto support finding probable cause based on the smell or sight of marijuana alone unless, under the totality of the circumstances, other facts would suggest to a reasonable person that the marijuana use or possession complies with [the act]"); *Massachusetts v. Overmyer*, 469 Mass. 16, 23 (2014) (holding that burnt or unburnt marijuana smell alone is insufficient to create probable cause because a human nose "cannot

discern reliably the presence of a criminal amount of marijuana, as distinct from an amount subject only to a civil fine"); *United States v. White*, No. 215CR00144KJDPAL, 2016 WL 3010824, at \*1 (D. Nev. May 25, 2016) ("[T]he strong odor of marijuana in a vehicle does give officers probable cause to search the vehicle to ensure the Defendant was acting in accordance with the terms of the medical marijuana provisions.").

However, this Court need not resolve the issue, because the totality of the circumstances in this case also includes evidence connecting the vehicle with a reported shooting. The Second Circuit has repeatedly identified guns as "tools of the trade" for drug dealers. *See, e.g.*, *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) ("[G]uns are tools of the narcotics trade, frequently carried by dealers, particularly when they engage in transactions involving drugs or money"); *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987) ("We often have taken judicial notice that, to substantial dealers in narcotics, firearms are as much tools of the trade as are the commonly recognized articles of narcotics paraphernalia."). Because Officer Diaz had reason to believe that a gun would be found within the Defendant's car prior to the stop, his observation of a small amount of marijuana not clearly labelled for medicinal use creates probable cause that evidence of illegal drug activity would be found within the car.

The connection between the reported shooting and the Defendant's BMW, the Defendant's furtive conduct, and the direct visual and olfactory evidence of at least a small quantity of marijuana in the car, are sufficient to create probable cause that Officer Diaz's search would uncover evidence of illegal drug

possession or use, regardless of the fact that the Defendant claimed to have a medical marijuana prescription prior to the search.

## IV.  Conclusion

For the foregoing reasons the Court DENIES Defendant's Motion to Suppress Evidence Obtained From Motor Vehicle Stop [Dkt. No. 38].

SO ORDERED this 9th day of January 2018 at Hartford, Connecticut.


_____/s/_____
Honorable Vanessa L. Bryant
United States District Judge